## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **CHRISTINE SOTO and GUSTAVO SANCHEZ, for themselves and on behalf of their daughter C.S.S.**<br><br>Plaintiffs<br><br>**v.**<br><br>**COMMONWEALTH OF PUERTO RICO; DEPARTMENT OF EDUCATION OF THE COMMONWEALTH OF PUERTO RICO**<br><br>Defendants | **CIVIL NO.** |

## COMPLAINT

1. Plaintiffs CHRISTINE SOTO and GUSTAVO SANCHEZ, for themselves and on behalf of their minor daughter C.S.S. (initials are used to protect the minor's identity), by and through their undersigned counsel, hereby file this Complaint against Defendants DEPARTMENT OF EDUCATION OF PUERTO RICO and the COMMONWEALTH OF PUERTO RICO, and allege as follows:

### I.    INTRODUCTION

2. This is a civil rights action brought under Title II of the Americans with Disabilities Act of 1990 (42 U.S.C. §§ 12101 et seq.) ("ADA"), Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794) ("Section 504") and Individuals with Disabilities Education Act (20 U.S.C. §§ 1400 et seq) ("IDEA").

3.    Plaintiffs seek injunctive and declaratory relief, compensatory damages, nominal damages, and attorneys' fees and costs to remedy the unlawful discrimination perpetrated by Defendants against C.S.S., a student with disabilities.

4.    This action arises from Defendants' persistent and systemic discrimination against C.S.S. based on her disabilities, including their failure to provide her with equal access to educational services and opportunities. Rather, they constitute a pattern of discrimination that violates the ADA, IDEA Section 504, and C.S.S.'s constitutional rights.

## II.    PARTIES

5.    Christine Soto (hereinafter "Mrs. Soto") and Gustavo Sanchez (hereinafter "Mr. Sanchez") are the parents of C.S.S.. and her legal guardians. Hereinafter, Mrs. Soto and Mr. Sanchez will be referred to, individually or jointly, as "parents."

6.    C.S.S. qualifies as a person with a disability under the definition provided by the Americans with Disabilities Act of 1990 (42 U.S.C. §§ 12101 et seq.) (Title II) and IDEA 1990 § 1401(3)(A).

7.    C.S.S.'s condition is a result of multiple health challenges, including Congenital Diaphragmatic Hernia, Hydrocephalus, Juvenile Idiopathic Scoliosis, Intermittent Strabismus, Dysphagia, Dextroposition of the Heart, Muscular Hypotonia, Expressive and Receptive Language Disorder, Gastrostomy, Chronic Pulmonary Problem, Mild Intellectual Disability, Attention Deficit Hyperactivity Disorder (ADHD), Social Communication Disorder, Motor Dyspraxia, and Visual Perception Problems.

8.    Co-defendant, the Commonwealth of Puerto Rico, is an unincorporated territory of the United States with a degree of self-governance. While it is not a state, Puerto Rico has its own constitution and manages internal affairs such as education, healthcare, and local

governance, subject to federal oversight. The Commonwealth is directly responsible for all the acts alleged in this complaint, both directly and through its officials, as detailed herein.

9. Co-Defendant, Department of Education of the Commonwealth of Puerto Rico, is an entity within the unincorporated territory of the United States, responsible for the public education system from Kindergarten through 12th grade in Puerto Rico. It is the entity legally obligated to comply with the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act., and Individuals with Disabilities Education Act (IDEA).

10. Co-Defendant, Department of Education of Puerto Rico of the Commonwealth of Puerto Rico, is directly responsible for all the acts alleged in this complaint, both directly and through its officials, as detailed herein.

### III.    JURISDICTION AND VENUE

11. This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343 because Plaintiffs' claims arise under federal law, specifically the ADA, Section 504 of the Rehabilitation Act. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because all parties reside in this district and the events or omissions giving rise to the claims occurred in this district.

### IV.    FACTS

12. Christine Soto and Gustavo Sánchez are the parents of a minor child, known as C.S.S., who qualifies as a person with a disability as defined under IDEA 1990 § 1401(3)(A). C.S.S.'s condition results from multiple health issues, including congenital diaphragmatic hernia, hydrocephalus, juvenile idiopathic scoliosis, intermittent strabismus, dysphagia, dextroposition of the heart, muscle hypotonia, expressive and receptive language disorder, gastrostomy, chronic lung disease, mild intellectual disability, attention deficit hyperactivity disorder (ADHD), social communication disorder, motor dyspraxia, and

visual perception problems. These conditions also qualify as a "disability" under the ADA, as described in 42 U.S.C. § 12102(1)(A).

13. Due to these conditions, C.S.S. qualifies and is currently enrolled in special education services through an Individualized Education Program (IEP). The Programming and Placement Committee has held several meetings outlining the specific requirements necessary to ensure that C.S.S. receives equitable and dignified educational opportunities comparable to her peers.

14. Initially, C.S.S.'s educational needs were addressed through a "purchase of services" agreement with "Colegio CADEI," as determined by a final resolution dated December 3, 2021.

15. However, throughout the January to June 2022 semester, five or more Programming and Placement Committee meetings identified deficiencies in the educational services provided by CADEI. Leticia López, the Designated Special Education Officer, attended most of these meetings.

16. Through her attendance, the Department of Education became aware that CADEI was not fulfilling most of the aspects of the proposed service agreement and, therefore, was not a suitable option for C.S.S.

17. During a meeting held in June, Timothy García was identified as the Special Education Support Services Officer responsible for managing the "purchases and service" process. Despite a communication sent to him on June 15, 2022, describing the identified issues, no response was received. Thus, during the 2022-2023 IEP review period, the Department of Education was aware that CADEI was no longer a suitable option for C.S.S. Despite this awareness, no response was given to the reported desire for public education options.

**a. Failure in the Mediation Process and Negligence by the Department of Education**

18. On July 7, 2022, a complaint was filed regarding the location, provision, and remuneration of associated services. This complaint was assigned to Grisselle Castro, who then delegated it to mediator Lisandra Rodríguez. Despite extending the mediation period and convening three separate meetings, multiple breaches persisted, as detailed below. During a meeting held on July 18, the Department of Education failed to comply with the agreed terms.

19. Initially, the Designated Special Education Officer, Leticia López, did not visit the proposed schools or assign CSEE Aguada personnel to interact with the family and organize their visits to the proposed institutions: José C. Rosario in Isabela, José de Diego in Aguadilla, and Aurora Méndez Charneco in San Sebastián. The second mediation meeting concluded without the visits being conducted.

20. The first agreement was not fulfilled as Leticia López did not accompany the parents to the José C. Rosario and José de Diego schools. Additionally, Leticia López later rejected José de Diego as a possible institution because it was an interconnected school, a fact she initially claimed to be unaware of. Upon visiting José C. Rosario, the parents arrived but found Leticia López absent, who instead sent Mrs. Echevarría as her representative. The school authorities, including the principal, were not informed of the visit, and the keys needed to access the room assigned to C.S.S. were unavailable.

21. Under these circumstances, Mrs. Castro contacted Leticia López, who scheduled another visit for August 16, 2022, at 8:00 a.m., citing an "Open House Day." However, after the first visit, it became evident that the school was unsuitable due to its deteriorated state and inadequate facilities.

22. Secondly, the planned placement was intended to involve a certified K-3 special education teacher and a student services assistant with nursing experience. Additionally, the assigned school for this placement was to have adapted English and physical education teachers to provide the required services.

23. On August 16, 2022, the failure to comply with this agreement became evident at José C. Rosario School. The school principal informed Christine Soto, the mother, and the grandparents of C.S.S. that the school was not a viable option for the child. Furthermore, the special education teacher, Mrs. Grajales, told Christine, "With all due respect, I do not feel prepared to work with C.S.S." Subsequently, Mrs. Grajales admitted to Christine that her K-3 certification had expired and that she had no plans to renew it, violating the mediation agreement established on July 18, 2022.

24. On August 16, 2022, the principal identified appropriate schools for enrollment, pointing out those unsuitable due to construction-related limitations. The principal specifically mentioned Ceferina Cordero School, as it had never been offered by Leticia López. Later, the student's mother approached the school directly to inquire about seat availability. The principal of Ceferina Cordero confirmed that space was available, instructing the mother to follow the application process with CSEE.

25. During the third mediation meeting on August 23, 2022, the parents of the minor, C.S.S., reported the availability of seats for their child, scheduling a school visit for August 30. Mrs. Christine Soto observed three available spaces that had not been previously offered. They were also informed that the third room, which they had not seen, was adjacent to a room with a private bathroom, connected by an internal door. This room was spacious, equipped with an air conditioner, and an air purifier. Although three English teachers were

present, their classes were fully enrolled. Therefore, an additional English teacher would need to be requested for the younger child, C.S.S. Since the school psychologist was expected to take maternity leave in October, not returning until January, a list of potential and irregular assistants was given to Mrs. Leticia López for personnel identification analysis.

26. It is noteworthy that by that time, classes had already begun, and parents Christine Soto and Gustavo Sánchez were still exploring alternatives that should have been coordinated following the partial mediation agreement of July 18, 2022.

27. By September 6, the minor, C.S.S., had not yet started school due to the principal's absence, violating the July 18, 2022, mediation agreement. This agreement stipulated the provision of a certified K-3 special education teacher, an English teacher, and a service assistant with nursing training. This situation persisted on September 7.

28. On September 8, 2022, the secretaries informed Christine Soto that the principal's presence was required for the registration process. Consequently, Mrs. Soto waited in her car for the principal to arrive. The principal arrived at 3:00 p.m., called Leticia López, citing the lack of availability of an English teacher for the minor, C.S.S. The principal also informed Christine Soto that the assigned teacher had no experience in regular classes and was scheduled to receive "training" with a second-grade teacher to understand and update the curriculum over a two-week period.

29. However, Mrs. Soto clarified that her daughter, C.S.S., would be enrolling in first grade, not second. Despite the lack of an English teacher, the child was enrolled, and a 'Study Certification' was issued. The parents intended to request the court to order the appointment of an English teacher, emphasizing that the lack of availability of such a

teacher was not considered an obstacle to starting public school; their primary goal was for C.S.S. to begin her studies.

30. On September 13, 2022, a court hearing was convened to assess the status of the ongoing proceedings. During this session, Mrs. Leticia López expressed concerns about the frequent absences of Mrs. Mayda Pérez, suggesting that she might not be a reliable option for the service assistant position.

31. Regarding the English teacher matter, the Department of Education acknowledged the impending maternity leave of the current teacher. They suggested that the school could request temporary support resources, marked as "point five" or "point thirty-three," from ORE to fill the gap.

32. The consensus was that a Programming and Placement Committee meeting would be beneficial, where all parties were expected to bring all pertinent information for discussion and attempt to resolve the issues related to the English teacher, T1, and the psychological therapy corporation. The judge scheduled the Programming and Placement Committee meeting for September 28, 2022.

33. A few days later, on September 16, 2022, it became necessary to reconfirm and reschedule the meeting dates with Mrs. Castro, the attorney for the Department of Education. This was due to the unexpected absence of the principal, despite the meeting having been ordered by a judge. During the rescheduling process, special attention was paid to Mrs. Leticia López's concerns, especially since Mrs. Mayda Pérez was being considered for the service assistant position.

34. Considering this fact, the parents of the minor, C.S.S., voiced their objections. These circumstances highlight the defendant's lack of due diligence both in the selection process and in service provision.

35. On September 27, 28, and 29, Mrs. Christine Soto maintained regular contact with teacher Grajales, scheduling meetings to discuss the minor, C.S.S. On September 30, Mrs. Christine Soto and the minor, C.S.S., attended an open house at the school to meet the teacher. However, upon speaking with Mrs. Grajales, she discovered that: 1) Mrs. Leticia López had not informed her about Cristina's situation, and she had not yet received the student's physical file. 2) There was no information about T1's status. As a result, Mrs. Christine Soto took the initiative to provide all necessary information regarding the minor, C.S.S.'s, diagnostic tests to the teacher. Additionally, Mrs. Christine Soto sent the same information by mail to the school principal, who did not respond.

36. The Programming and Placement Committee meeting was held on October 7, 2022, where the ongoing issues of non-compliance and negligence by the Department of Education were discussed as follows:

37. The Department of Education representative, Leticia López, apparently lacked knowledge about the grade level and curriculum access, which, according to her, was the reason behind the inability to coordinate the necessary services. This issue had never been controversial during the hearings or other meetings, and thus, it was a surprise to Mrs. Christine Soto.

38. Regarding the English teacher, an issue known since Mrs. Christine Soto's enrollment on September 8, 2022, the lack of an English teacher had previously been reported during the hearing. However, the principal informed them that day that it was necessary to provide a

possible schedule (a requirement never before mentioned) to request an English teacher. Immediately, Mrs. Christine Soto provided the necessary schedule.

39. Concerning T1, Mrs. Leticia López, who had previously mentioned on September 13, 2022, that Mrs. Mayda Pérez was frequently absent, stated that the latter had not informed the school administration of her inability to attend to the student. However, she admitted to receiving a letter from a teacher on this matter.

40. Regarding gastrostomy management training, Mrs. Leticia López expected the school nurse to train T1. However, the nurse responded that he was not qualified for such training, as he only had basic nursing knowledge and no experience in this particular area. He suggested that the Department of Education should provide T1 with training delivered by a certified person.

41. This situation further evidenced the inconsistencies and negligence of the Department of Education.

42. That same day, October 7, 2022, the Principal authorized teacher Lissette Grajales to travel to Aguada to retrieve the student's file that afternoon. This was because even a month after the student's enrollment, no file was available for the teacher to use in preparation for providing services. By this date, C.S.S. had been unable to start school because it was unclear who the service assistant was, there was no approval letter for T1 for the Provisional Resource, and the July 18, 2022, mediation agreement (which required a certified K-3 special education teacher and an English teacher) was not being fulfilled.

43. On October 9, Mrs. Christine Soto approached the social worker, Yulinette Pérez, asking for help in creating a behavior modification plan, a recognized need.

44. Subsequently, on October 11, Mrs. Christine Soto visited the school with the minor, C.S.S., to meet with teacher Grajales and begin diagnostic tests. However, she learned that the teacher had faced a health issue and had to leave. Mrs. Soto took this opportunity to speak with the social worker, whom she knew could help with the behavior modification plan. The social worker assured her that once the document was ready, she would inform the parents. Unfortunately, such communication never took place.

45. The Department of Education canceled the Programming and Placement Committee meeting scheduled for October 12, citing the lack of availability of both the teacher, due to a foot injury sustained at school, and the principal. Faced with this situation, the plaintiffs filed a motion the same day before the administrative judge overseeing the case, requesting information on the measures the Department of Education was taking to ensure the necessary staff training so that the minor, C.S.S., could start classes promptly.

46. On October 18, 2022, a meeting took place between the plaintiffs, represented by their attorney, and the Department of Education with the new administrative judge. During that meeting, it was agreed that the attorneys would meet again on October 26, 2022, to discuss the draft IEP 2022-2023, provide updates on who would train T1, and address the issue of the lack of a special education teacher, a problem the Department of Education had just realized.

47. During that meeting, the Department of Education did not oppose the judge ordering the appointment of an English teacher (a decision that did not need to wait for a court order, as of October 8, 2022, the school principal had announced that they would post the position, and the English teacher was a mediated agreement from July 18, 2022). However, an order was issued to appoint the English teacher. Additionally, an administrative hearing was set

for November 18, 2022. The minor, C.S.S., was unable to attend school because it was reported that there was no special education teacher due to an accident, in addition to the July 18, 2022, mediated agreements (certified K-3 special education teacher and English teacher) not being fulfilled.

48. Throughout October and November 2022, the Department of Education consistently communicated to the plaintiffs that their daughter, the minor, C.S.S., could not attend her classes due to the unavailability of a special education teacher who had sustained a foot injury in an accident.

49. From October 11, 2022, until December 21, 2022, the minor, C.S.S., was unable to attend school as a result of the Department of Education's ongoing updates regarding the absence of the special education teacher, as it acknowledged numerous times the lack of a special education teacher on site. The child's parents were not informed of the teacher's return after her leave.

50. From October to December 2022, there was a critical failure both in communication and in the adequate provision of education for the minor, C.S.S., by the Department of Education. A potential solution was proposed through private and virtual education, but this was hindered by a variety of obstacles and communication issues. Despite the tireless efforts of C.S.S.'s parents and their attorney, the problematic situation persisted, resulting in C.S.S. being absent from school during these months. To exacerbate the problem, C.S.S.'s teacher, who had been on sick leave, was silently reinstated without prior notice, further worsening the existing situation.

51. From January to May 2023, issues with C.S.S.'s education and care by the Department of Education continued, despite various motions, court orders, and meetings.

52. On January 23, 2023, the minor, C.S.S., attended Ceferina Cordero School as established in the Administrative Hearing. She was received by the school principal, Luis Grajales, and introduced to the teacher assigned to the special education position, Mr. Noamette Laboy. According to the information provided by the Department of Education, Mr. Laboy's preparation was based on being a regular K-12 teacher, with no training or experience in special education. Moreover, he had no prior teaching experience, and C.S.S. represented his first teaching opportunity. Facilitator Jaqueline Butler instructed Mr. Laboy to administer diagnostic tests to the minor.

53. However, upon arriving at the classroom, the teacher had no teaching materials, manipulatives, or even a pencil to conduct the diagnostic test. According to the teacher's admission to the child's mother, while he was informed of the case controversy at the time of his hiring, he was not given guidance on what type of training he would receive to meet the student's needs in implementing the general curriculum, curricular adaptations, modifications, and implementation of accommodations, among others. The principal was informed that the mother would assist as an aide through a provisional resource.

54. On March 15, 2023, the child's parents, through their legal representative, sent an email to the school, the parents, the Department of Education's attorney, and the case investigator, formally requesting the draft 2022-2023 Individualized Education Program (IEP) prepared by Mr. Laboy, based on his observations, qualifications curriculum, and diagnostic tests conducted at Ceferina Cordero School, to be discussed at the next meeting.

55. The administrative judge issued an order for Mr. Laboy and the English teacher to appear as witnesses. Copies of the plans they had worked on with the student were also requested, along with their plans for the rest of the semester.

56.  The next communication received by the parents was on March 21, 2023, when they learned of Mr. Laboy's resignation and the principal's transfer to another position within the Department of Education. It is believed that Mr. Laboy's resignation was due to the parents' request for information related to his work with C.S.S. and his lack of preparation for the case.

57.  Subsequently, evidence of his work was received, where improvisation was evident. To date, C.S.S. has not received an adequate education, the section V of the draft 2022-2023 IEP has not been addressed, and there is clear improvisation in teaching, lack of administrative supervision, and proper guidance.

58.  On March 22, 2023, the parents informed all members of the IEP meeting and the Secretary of Education by email that C.S.S. would attend school despite the teacher's resignation, to prevent the Department of Education from using the lack of student placement as an excuse.

59.  On April 11, 2023, an IEP meeting was held, where a suggested agenda was presented to address pending issues. It was not possible to address the Behavior Modification Plan, Compensatory Services, Diagnostic Tests, Academic Progress, Service Aide Training, and the 2022-2023 IEP draft. Therefore, it was agreed to continue at another IEP meeting.

60.  On April 28, 2023, the IEP meeting was canceled due to the administration of META exams. To date, the pending issues mentioned above have not been addressed.

61.  After several delays in the administrative process, on May 9, 2023, the case was assigned to a fourth administrative judge due to the resignation of the previous judge. The case was assigned to presiding judge Amelia Cintrón. This situation caused concern among the

parents, due to the delay that a new judge would need to familiarize themselves with all the details of the case.

62. On May 15, 2023, the minor's parents and the Department of Education filed a motion with the Special Education Administrative Forum reporting the agreements reached, such as the need to reconvene the IEP meeting on June 7, 2023, agreements on compensations for physical, oral-motor, speech and language, occupational, psychological, and educational therapies, and the determination that the Department of Education could not appoint or hire a special education teacher who could meet the student's needs, her placement and qualifications, and therefore, within a reasonable time frame, must take action to find an appropriate teacher.

63. Subsequently, on May 22, 2023, a Final Resolution was issued by the Special Education Administrative Forum, encompassing the agreements and ordering their compliance.

64. These agreements, to date, have not been fulfilled. The Department of Education has failed to meet the student's educational needs. In this context, the effective implementation of an IEP and the submission of documents for transportation and education scholarships have been hindered.

65. Although Mrs. Vanessa Hilerio Soto was later assigned as the special education teacher for the minor, this assignment has not resulted in adequate progress for the minor. Mrs. Hilerio Soto, like the new principal, Luis Vega, was introduced to the case without prior guidance and without an individualized educational plan for the student. Both arrived and found themselves in an environment of improvisation and lack of access to an appropriate curriculum for the student.

66. Although Hilerio has been working with the student, there has been no evidence of proper access to the curriculum, despite the IEP meetings' agreements stating that the student must have individual access to a first-grade curriculum.

67. Both Hilerio and Vega were hired by the agency and sent to the school without adequate support. Although Hilerio has been working with the student, there has been no evidence of proper access to the curriculum, despite the IEP meetings' agreements stating that the student must have individual access to a first-grade curriculum.

68. The situation worsened on June 5, 2023, when the parents were informed of the decision to promote the student to second grade without a proper individualized educational plan and without an assessment of her competencies.

69. Promoting the student to second grade without having had the opportunity to effectively develop an IEP in the first grade presents a significant obstacle to her learning, as this plan represents an essential part of the educational process for special needs students, providing a framework to adapt teaching and learning to the student's individual needs. In the case of specialization, the first semester was lost due to teacher Grajales' departure and the lack of an adequate educational plan, while the second semester was hindered by the hiring of unqualified teachers and the lack of assistance and technical support.

**b. Negative Impact of the Department of Education's Actions and Omissions on C.S.S.'s Learning Process**

70. The minor's education was disorganized and improvised, preventing her from developing the necessary first-grade skills. Her progress was not adequately evaluated, and no curricular plan adjusted to her needs was implemented, resulting in an unsustainable learning gap. Therefore, it is evident that the minor did not acquire the knowledge and

skills required for first grade, calling into question the validity of her promotion to second grade.

71. This promotion decision, based on the school organization's interests rather than the individual needs of the minor, is concerning and potentially detrimental to her academic and personal development. In fact, by being promoted without meeting the necessary educational requirements, the minor will face even greater challenges in second grade without the essential tools and skills acquired in first grade, causing significant harm to both her and her parents.

72. The Department of Education has shown a primary interest in meeting the school's needs rather than those of the student. The goal of promoting the student to second grade and eliminating her individual support seems to benefit the creation of a group of four students rather than the student's progress.

73. Despite the agreements reached since 2021 to meet the student's needs, these have been consistently violated. In this context, the effective implementation of an IEP and the submission of documents for transportation and education scholarships have been hindered.

74. To date, the complaint filed in July 2022 has gone through four judges, two school principals, and three teachers appointed by the Department of Education. C.S.S. still has the same 2019-2020 IEP due to complications with the Department of Education.

75. In the special education administrative field, there is instability that prevents processes from being conducted fairly for special education students. The lack of compliance and the crisis caused by the Department of Education in the administrative forums due to lack of payment and delay in providing FAPE according to IDEA law have only benefited the

Department of Education at a time when the agency is understood to have a considerable budget allocation to meet students' needs and offer quality service.

76. Each day of non-compliance increases the likelihood that C.S.S. will be unable to function as a functional citizen, capable of understanding the effects of daily life, developing self-sufficiency skills, and seeking, finding, and maintaining a job in the future.

77. The continued delays further hinder C.S.S.'s understanding and acquisition of general and functional cognitive skills, placing us in the position of being the only ones able to understand and meet her needs. This causes frustration, helplessness, anger, and sadness in the plaintiffs for not being able to witness the expected justice in the processes.

78. C.S.S.'s mother has made personal sacrifices to act as an aide (T1), working through a provisional remedy and with the Department of Education despite all the setbacks caused by these agencies. Furthermore, she is a 24/7 caregiver.

79. The mother is emotionally and physically exhausted. The minor's father has also made countless sacrifices of time, effort, and resources to ensure that his daughter receives a specialized and quality education. For him, it is an emotional challenge to maintain good performance in his job as a Mechanical Engineer, which is inherently complex.

### c. The Department of Education's actions and omissions constitute a pattern of discrimination against C.S.S. based on her disability.

80. The Department of Education has shown significant lack of diligence, negligence, and indifference in developing an educational plan that adequately addresses the minor student's needs.

81. This negligence has manifested through continuous delays in the administrative process to update the Individualized Education Program (IEP), as well as in providing the student

with the necessary accommodations to ensure a personalized and comprehensive education appropriate to her special needs.

82. Additionally, the Department of Education has been directly responsible for systematic delays in the process due to the lack of foresight for foreseeable issues such as staff availability and the allocation of adequate educational resources. Progress has been hindered by numerous setbacks, including the repeated unavailability of its staff (even after coordinating availability), the resignation of three administrative judges, changes in school management, and the resignation of three teachers appointed by the Department of Education itself.

83. These setbacks indicate a pattern of discrimination and lack of diligence by the Department of Education, raising doubts about its ability to act effectively and quickly in the student's best interest.

84. This type of attitude and performance not only affects the administrative process but also hinders the primary goal: to ensure that the student receives an education that enables her to develop the tools and skills necessary to become a functional citizen who contributes to society. It is imperative that the Department of Education assumes its responsibility and demonstrates a genuine commitment to providing a free and appropriate public education, as required by IDEA.

85. For its part, the Special Education Support Center (CSEE) failed in its responsibilities, such as ensuring that mediation agreements were fulfilled (such as ensuring the presence of a certified special education teacher and an English teacher, and a student services assistant with nursing training), coordinating visits to the proposed schools, and facilitating the enrollment and transfer process for the student.

86. The Department of Education has exhibited a systematic pattern of negligence and discrimination towards the minor C.S.S., hindering her access to adequate education. This conduct has negatively impacted both her educational and emotional development, demonstrating indifference towards her special needs. The following allegations illustrate this discriminatory conduct:

87. C.S.S. was left without an adequate school placement and without access to effective education, forcing her mother to take her to work, considering the minor's age and medical and educational needs.

88. On multiple occasions, the Department of Education failed to provide a certified special education teacher or trained support staff, which is essential to address C.S.S.'s educational needs.

89. There were failures in the planning and communication of visits to designated schools, resulting in a lack of preparation and coordination, as evidenced by the visits to José C. Rosario and José de Diego schools, where the facilities were not prepared or suitable to receive C.S.S.

90. The denial of the right to an adequate school placement was evidenced when school authorities admitted that the proposed facilities did not meet the minor's specific needs, highlighting the lack of accessibility and safety conditions.

91. Despite attempts to resolve the matter through mediation, the Department of Education failed to comply with the agreements reached, demonstrating a lack of commitment to addressing C.S.S.'s needs.

92. During the mediation period, school authorities did not conduct the necessary visits to the proposed institutions or designate appropriate personnel to interact with the family and organize these visits.

93. The mediation agreements required the presence of a certified K-3 special education teacher and a student services assistant with nursing training, which was not fulfilled, leaving C.S.S. without the necessary support for her education.

94. Unjustified delays and lack of effective communication in the implementation of the agreed recommendations, such as the installation of specific services and accommodations at designated schools, were presented.

95. Failure to comply with the agreed conditions, such as the refusal of teaching staff to work with C.S.S. due to inadequate training, underscores the Department's lack of preparation to fulfill its obligations.

96. The Department of Education's omissions and actions not only affected C.S.S.'s access to education but also caused significant emotional harm to the minor and her family.

97. This impact is evident due to the uncertainty and instability created by the lack of an adequate educational environment, which has negatively affected C.S.S.'s emotional health, hindering her ability to participate effectively in her education.

98. The lack of support and specialized services has resulted in a regression in C.S.S.'s academic progress, preventing her from achieving comprehensive development and limiting her learning opportunities.

99. The continuous turnover of staff and the absence of an individualized educational plan have created a disorganized environment, making it difficult to implement effective educational strategies for C.S.S.

## V.    CAUSE OF ACTION

### Violations of Individuals with Disabilities Education Act

100.  Plaintiffs incorporate the preceding paragraphs.

101.  Under IDEA, the Department of Education is obligated to provide equal access to education for students with disabilities. The Department's actions regarding C.S.S. constitute a violation of this fundamental principle. By failing to ensure the implementation of an adequate Individualized Education Program (IEP), the Department of Education has denied C.S.S. access to an education tailored to her needs, violating her right to receive a free and appropriate public education.

102.  The repeated failures to coordinate and provide the necessary educational services, including the lack of trained teachers and support staff, have obstructed C.S.S.'s access to the benefits of an adequate public education.

103.  The Department of Education's failure to provide adequate training and policies for its staff demonstrates an additional violation of its obligations under IDEA. The lack of specialized training for teachers and support staff in handling the educational needs of C.S.S. has resulted in an ineffective educational environment that fails to meet the standards of equality and non-discrimination established by IDEA.

104.  The absence of effective policies to ensure the implementation and supervision of necessary accommodations has perpetuated the lack of adequate access for C.S.S., evidencing a lack of commitment from the Department of Education to fulfill its responsibilities under federal law.

105.  The Department of Education's inaction regarding the training needs and resources for staff has contributed to an environment of exclusion and discrimination, directly violating C.S.S.'s rights as a student with disabilities.

106.  The Department of Education violated IDEA by setting guidelines to promote C.S.S. to second grade without the implementation of an appropriate IEP and without first evaluating the student's specific and individualized needs, thus violating IDEA's emphasis on individualized consideration of a child's needs to provide a FAPE.

107.  The Department of Education violated IDEA by establishing procedures, policies, and guidelines that allow for the automatic continuation of an outdated IEP in violation of IDEA, depriving the student of a FAPE, when there are disputes over appropriate services, seeking to evade responsibility by not resolving these disputes and having an IEP that complies with each child, every year in a timely manner, placing the responsibility for the lack of a FAPE on the parents, not the educational agency.

108.  The Department of Education's actions transgress the statutory guarantees of IDEA by establishing procedures, policies, and guidelines that fail to account for previous administrative rulings, failing to adequately consider whether they are binding on a COMPU and for the determination of future special education services.

109.  The Department of Education breaches IDEA by failing to meet its obligation to fulfill agreements reached to provide timely and efficient FAPE to C.S.S., through a valid and applicable IEP, and shifting the responsibility for the student not receiving timely education or services to the parents, who must either accept an inadequate IEP or services or be subjected to the Department of Education not providing an updated IEP.

110. In summary, IDEA provides for the provision of compensatory services when a FAPE has been denied. C.S.S. is entitled to at least three years of compensatory services due to the Department of Education's persistent refusal to provide full and appropriate services for C.S.S. as described above, as the public entity failed to comply with administrative rulings, failed to prepare or implement conforming IEPs, and/or denied C.S.S.'s and the parents' fundamental procedural and substantive rights by failing to ensure that IEPs were prepared on time, even if there was controversy, to continue providing a FAPE, not accessing re-evaluations, and subjecting parents to emotional and physical stress and strain due to the Department of Education's negligence in providing C.S.S. access to educational services appropriate to her special needs.

111. Section 1415 (i)(3)(B) of IDEA provides that a court may award attorney's fees and costs to the parents or guardians of a child with a disability who prevails in an administrative or judicial proceeding. Plaintiffs request and are awarded attorney's fees and costs required in this litigation to obtain the resources that are due to C.S.S.

**Violations of Title II of the Americans with Disabilities Act**

112. Plaintiffs incorporate the preceding paragraphs.

113. At all times relevant to this action, Title II of the ADA, 42 U.S.C. § 12131 et seq., has been in full force and has applied to the conduct of the Department of Education of the Commonwealth of Puerto Rico.

114. At all times relevant to this action, the plaintiff C.S.S. has substantial limitations in daily life activities, such as communication skills, and has been a person with a disability as defined by the ADA.

115. The defendant is a public entity as defined under Title II of the ADA, 42 U.S.C. § 12131(1).

116. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

117. Federal regulations implementing Title II of the ADA provide that a public entity may not "(i) deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service; (ii) afford a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others; or (iii) provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others." 28 C.F.R. § 35.130(b)(1).

118. The defendant discriminated against minor C.S.S. based on her disability by arbitrarily, unjustly, and without valid reason excluding her from participation in its services and by denying her the benefits of those services. This exclusion and denial not only constitute a direct violation of the ADA but also represent a persistent pattern of discriminatory practices directly related to the minor's disability.

119. This unjust exclusion has not only exacerbated the educational challenges faced by C.S.S. but has also inflicted considerable emotional and psychological harm on her, further hindering her academic progress and personal development. The fear and anxiety generated by the Department of Education's actions have created a hostile environment

that has significantly affected the minor's ability to participate in her education on an equal footing with her peers.

120. The refusal to provide an accessible and safe educational environment has resulted in the exclusion of C.S.S. from fully participating in the educational system, contravening the provisions of Title II of the ADA, which guarantee equal opportunities.

121. As stated above, in the absence of injunctive relief, there is a clear risk that the defendant's actions will arbitrarily recur with the plaintiffs and that she will continue to be deprived of access to government benefits. The systemic denial of necessary services underscores the deliberate nature of the discrimination in question.

122. The defendants have intentionally discriminated against minor C.S.S. through their actions. As a direct and proximate result of the defendant's illegal discrimination, the plaintiffs have suffered injuries and damages, including pain, suffering, and mental anguish, due to the academic failures and communication limitations suffered by minor C.S.S. at a crucial stage in her academic and personal development.

123. Therefore, plaintiffs are entitled to compensatory damages for the injuries and losses suffered as a result of the defendant's discriminatory conduct, as alleged above.

124. They are also entitled to an award of attorney's fees, costs, and expenses, pursuant to the ADA, 42 U.S.C. § 12133.

125. Additionally, injunctive relief is necessary to prevent further harm and to ensure that C.S.S. receives the educational services and accommodations to which she is legally entitled, without fear of further discrimination.

### Violations of Section 504 of the Rehabilitation Act

126. Plaintiffs repeat and reallege all preceding paragraphs in support of this claim.

127. At all times relevant to this action, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, has been in full force and effect and has applied to the Defendants conduct.

128. At all times relevant to this action, the minor C.S.S.. have had a substantial limitation to the major life activities and has been an individual with a disability within the meaning of the Rehabilitation Act.

129. At all times relevant to this action, Defendants have been in a program or activity receiving federal financial assistance and are therefore subject to the Rehabilitation Act.

130. Pursuant to Section 504 of the Rehabilitation Act, "[n]o otherwise qualified individual with a disability shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

131. Defendants subjected the minor C.S.S. to discrimination based on her disability, in violation of 29 U.S.C. § 794.

132. Plaintiffs are therefore entitled to seek and recover compensatory damages for the injuries and loss they sustained as a result of Defendants discriminatory conduct and deliberate indifference as hereinbefore alleged, pursuant to 29 U.S.C. § 794(a).

133. Plaintiffs are further entitled to an award of attorney's fees, costs, and disbursements pursuant to the Rehabilitation Act, 29 U.S.C. § 794(a).

## VI.    JURY TRIAL DEMANDED

134. Plaintiffs request jury trial on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs prays for:

A.  Declare that Defendants have violated the Plaintiffs' rights under the Title II of the ADA and Section 504 of the Rehabilitation Act.

B.  A declaration stating that the Defendant has violated the federal rights of C.S.S., guaranteed by the Individuals with Disabilities Education Act (IDEA), based on deficient practices and procedures in the matters described in the causes of action.

C.  A preliminary order instructing the Department of Education to provide C.S.S. with all the educational services required and that are consistent with her special needs.

D.  A preliminary order to convene a COMPU meeting within no more than 30 days to prepare an IEP for the 2024-2025 school year that complies with the law and accepted evaluations, and that includes all necessary services.

E.  Enter a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that all Defendants have subjected Plaintiffs to unlawful discrimination in violation of Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

F.  Issuance of permanent injunction requiring Defendants to undertake remedial measures to mitigate the effects of Defendant's past and ongoing violations of Title II of the ADA and Section 504 of the Rehabilitation Act, and the regulations promulgated under those statutes.

G.  Compensatory damages pursuant to Title II of the Americans with Disabilities Act, 42 U.S.C. § 1988 and Section 504 of the Rehabilitation for the emotional harm caused to the minor in her educational process, and the mental anguish and worries that parents have had.

H.    Nominal damages because Defendants subjected Plaintiffs to unlawful discrimination in violation of Title II of the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act.

I.    Payment of reasonable costs, litigation expenses, and attorneys' fees, pursuant to 20 USC § 1415(i)(3)(B).

J.    The provision of whatever other relief the Court deems just, equitable and appropriate.

Dated: September 5,  2024.

> VELEZ LAW GROUP LLC
> Civil Rights Division
>
> s/José Carlos Vélez Colón
> José Carlos Vélez Colón
> USDC-PR 231014
>
> RR 18 BOX 1390 #311
> San Juan, PR 00926-9821
>
> E:    vlg@velezlawgroup.com
> T:    (787)-422-1881
>
> PLAINTIFF'S ATTORNEY